Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUBREY URBANOWICZ,<br><br>    Plaintiff,<br><br>v.<br><br>HMS HOLDINGS CORP., ROBERT BECKER, BILL LUCIA, CRAIG R. CALLEN, KATHERINE BAICKER, ELLEN A. RUDNICK, JEFFREY A. RIDEOUT, BART M. SCHWARTZ, RICHARD H. STOWE, and CORA M. TELLEZ,<br><br>    Defendants. | Case No:<br><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Aubrey Urbanowicz ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

## NATURE OF THE ACTION

1. This is an action against HMS Holdings Corp. ("HMS" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections

14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of HMS by Gainwell Acquisition Corp. ("Gainwell"), Mustang MergerCo Inc., a wholly owned subsidiary of Gainwell ("Merger Sub"), and Gainwell Intermediate Holding Corp ("Intermediate Holdco").[1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and HMS maintains offices in New York City.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of HMS common stock.

---

[1] Gainwell is an affiliate of Veritas Capital Fund Management, L.L.C. ("Veritas Capital").

7. Defendant HMS, through its subsidiaries, provides cost containment solutions in the United States healthcare marketplace. The Company is incorporated in Delaware. The Company's common stock trades on the Nasdaq Global Select Market under the ticker symbol, "HMSY."

8. Defendant Robert Becker ("Becker") is a director of the Company.

9. Defendant Bill Lucia ("Lucia") is President, Chief Executive Officer, and Chairman of the Board of the Company.

10. Defendant Craig R. Callen ("Callen") is a director of the Company.

11. Defendant Katherine Baicker ("Baicker") is a director of the Company.

12. Defendant Ellen A. Rudnick ("Rudnick") is a director of the Company.

13. Defendant Jeffrey A. Rideout ("Rideout") is a director of the Company.

14. Defendant Bart M. Schwartz ("Schwartz") is a director of the Company.

15. Defendant Richard H. Stowe ("Stowe") is a director of the Company.

16. Defendant Cora M. Tellez ("Tellez") is a director of the Company

17. Defendants Becker, Lucia, Callen, Baicker, Rudnick, Rideout, Schwartz, Stowe, and Tellez are collectively referred to herein as the "Individual Defendants."

18. Defendants HMS and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

19. On December 21, 2020, HMS and Gainwell Technologies announced that they had entered into a definitive agreement whereby Gainwell would acquire HMS. According to the release, HMS shareholders would receive $37.00 in cash per share. The press release announcing

the merger states, in pertinent part:

**HMS to be Acquired by Veritas Capital-Backed Gainwell for $37.00 Per Share**

December 21, 2020 09:00 ET | **Source:** HMS Holdings Corp

*Transaction Expands Gainwell's Capabilities as an Analytics-Driven Healthcare Technology Provider*

*Cotiviti to Subsequently Acquire Certain Business Lines, Expanding Health Plan Solutions*

*All-Cash Transaction Values HMS at Approximately $3.4 Billion*

IRVING, Texas, Dec. 21, 2020 (GLOBE NEWSWIRE) -- HMS (Nasdaq: HMSY) ("HMS"), an industry-leading technology, analytics and engagement solutions provider helping organizations reduce costs and improve health outcomes, and Veritas Capital ("Veritas")-backed Gainwell Technologies ("Gainwell"), a leading provider of solutions that are vital to the administration and operations of health and human services programs, today announced that they have entered into a definitive agreement whereby Gainwell will acquire HMS. Under the terms of the agreement, HMS shareholders will receive $37.00 in cash per share. The per share purchase price represents a 52% premium to HMS' unaffected share price as of October 2, 2020, the last trading day prior to when reports of a possible transaction were published, and a 17% premium over the 30-day volume-weighted average price per share of HMS' common stock through the close of trading on December 18, 2020, the last trading day before the announcement of the transaction. The transaction is expected to close in the first half of 2021.

Veritas will look to optimize the HMS solution set across Gainwell and Veritas-backed Cotiviti, Inc. ("Cotiviti"), a leading provider of data-driven healthcare solutions. Gainwell will acquire the HMS capabilities focused on the Medicaid market, including solutions delivered to states and managed care organizations, and Cotiviti will acquire the HMS capabilities focused on the commercial, Medicare, and federal markets. The addition of the HMS business lines will further expand Gainwell's and Cotiviti's capabilities with unique, data-driven technology and service solutions expected to drive greater impact in the healthcare market. Clients will be offered a broad range of complementary, scalable and flexible solutions that improve outcomes and quality as well as reduce waste and inefficiencies through technological innovation, service excellence and unparalleled industry expertise.

*        *        *

**Transaction Details**

The transaction will result in an enterprise value for HMS of approximately $3.4 billion. The transaction, which was unanimously approved by HMS' Board of Directors, is expected to close in the first half of 2021. The closing of the transaction is subject to the approval of HMS shareholders and the satisfaction of customary closing conditions, including applicable regulatory approvals.

**Advisors**

Barclays is acting as financial advisor to HMS, and Latham & Watkins LLP is serving as legal advisor to HMS.

Goldman Sachs & Co. LLC is acting as exclusive financial advisor to Gainwell, and Schulte Roth & Zabel LLP is serving as legal advisor to Gainwell.

**About HMS**

HMS advances healthcare by helping organizations reduce costs and improve health outcomes. Through our industry-leading technology, analytics and engagement solutions, we save billions of dollars annually while helping consumers lead healthier lives. HMS provides a broad range of payment accuracy and population health management solutions that help move healthcare forward. For more information, visit **www.hms.com**.

**About Gainwell Technologies**

With over 7,500 employees, Gainwell Technologies supports clients across 42 U.S. states and territories with offerings including Medicaid Management Information Systems (MMIS), fiscal agent services, program integrity, care management, immunization registry and eligibility services. With over 50 years of proven experience, Gainwell carries forward a reputation for technological innovation, service excellence and unparalleled industry expertise in offering clients scalable and flexible health and human services solutions for their most complex challenges. For more information, visit **www.gainwelltechnologies.com**.

**About Cotiviti**

Cotiviti is a leading solutions and analytics company that is reshaping the economics of healthcare, helping its clients uncover new opportunities to unlock value. Cotiviti's solutions are a critical foundation for healthcare payers in their mission to lower healthcare costs and improve quality through higher performing payment accuracy, quality improvement, risk adjustment, and network performance management programs. Cotiviti's healthcare solutions are powered by Caspian Insights, a proprietary data and analytics platform spanning thousands of unique member and provider data types across financial and clinical domains, representing the most comprehensive longitudinal data set in healthcare. The company also supports the retail industry with data management and recovery audit

services that improve business outcomes. For more information, visit **www.cotiviti.com**.

**About Veritas Capital**

Veritas is a leading private investment firm that invests in companies that provide critical products and services, primarily technology and technology-enabled solutions, to government and commercial customers worldwide, including those operating in the healthcare, national security, software, education, aerospace & defense, government services, communications and energy industries. Veritas seeks to create value by strategically transforming the companies in which it invests through organic and inorganic means. For more information, visit **www.veritascapital.com**.

20. On February 4, 2021, Defendants caused to be filed with the SEC a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") pursuant to Section 14(a) of the Exchange Act in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

21. The Proxy Statement, which recommends that HMS shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the Company's financial projections; (ii) the financial analyses performed by the Company's financial advisor, Barclays Capital Inc. ("Barclays"), in connection with its fairness opinion; (iii) potential conflicts of interest involving Barclays; and (iv) the sales process leading up to the Proposed Transaction.

22. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Recommendation of the Board and Reasons for the Merger; (iii) Fairness Opinion of HMS's Financial Advisor: Barclays Capital Inc.; and (iv) Certain Financial Forecasts.

23. Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote on the Proposed Transaction, HMS shareholders

6

will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1. Material Omissions Concerning the Company's Financial Projections

24. The Proxy Statement omits material information concerning the Company's financial projections.

25. The Proxy Statement provides certain unaudited prospective financial information (the "Company Forecasts") which were made available to the Board in connection with its consideration of the Proposed Transaction, and were also provided by the Company's senior management to Barclays in connection with the rendering of its opinion to the Board and performing its related financial analysis.

26. With respect to the Company Forecasts, the Proxy Statement fails to disclose the following: (1) all line items underlying (i) EBITDA, (ii) Adjusted EBITDA, (iii) NOPAT, and (iv) Unlevered Free Cash Flow; (2) the Company's net income projections; and (3) a reconciliation of all non-GAAP to GAAP financial metrics.

27. When a company discloses non-GAAP financial metrics in a Proxy Statement, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures

as such measures can be misleading and "crowd out" more reliable GAAP information.[2]

28. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

29. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning Barclays' Analyses

30. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Barclays.

31. With respect to Barclays' "*Selected Comparable Company Analysis*," the Proxy Statement fails to disclose the individual multiples and financial metrics of the companies Barclays observed in its analyses.

---

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Feb. 10, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

32. The Proxy Statement fails to disclose the following concerning Barclays' "*Discounted Cash Flow Analysis*": (1) all line items underlying HMS's projected after-tax unlevered free cash flows for the three month period from October 1, 2020 to December 31, 2020 and for the fiscal years from 2021 through 2024; (2) the terminal value of HMS as of the end of fiscal year 2024; (3) the individual inputs and assumptions underlying the (i) perpetuity growth rates ranging from 4.0% to 4.5%, and (ii) range of discount rates of 9.0% to 10.0%; (4) HMS' net debt as of September 30, 2020; and (5) the fully diluted number of shares of HMS common stock.

33. With respect to Barclays' "*Equity Research Target Prices Analysis*," the Proxy Statement fails to disclose: (1) the individual price targets observed by Barclays in its analyses; and (2) the sources thereof.

34. With respect to Barclays' "*Leveraged Acquisition Analysis*," the Proxy Statement fails to disclose the individual inputs and assumptions underlying the (i) a debt capital structure of HMS comprised of pro forma leverage of total debt to EBITDA of 7.0x, (ii) equity investment that would achieve an internal rate of return of 17.5% on equity invested during a five-year period, and (iii) a projected EBITDA terminal value multiple of 11.5x to 14.5x for such period.

35. The Proxy Statement fails to disclose the following concerning Barclays' "*Illustrative Present Value of Future Stock Price Analysis*": (1) the implied future enterprise values of HMS for fiscal year end 2021 and each of the next two fiscal year ends; (2) the individual inputs and assumptions underlying the (i) ratios of HMS's EV to EBITDA for the next twelve months period ranging from 11.5x to 14.5x to NTM EBITDA estimates, and (ii) discount rate of 10.5%; (3) the estimated fully diluted number of shares of HMS common stock; and (4) the estimate of the cost of equity for HMS.

36. The valuation methods, underlying assumptions, and key inputs used by

Barclays in rendering its purported fairness opinion must be fairly disclosed to HMS shareholders. The description of Barclays' fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, HMS shareholders are unable to fully understand Barclays' fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving Barclays

37. The Proxy Statement omits material information concerning potential conflicts of interest involving Barclays.

38. The Proxy Statement provides that, on December 13, 2020, "Barclays delivered [a letter] to the Board earlier that day regarding certain of Barclays' relationships with HMS and potential counterparties to a strategic transaction with HMS. Following discussion, the Board determined that the relationships disclosed in such letter would not adversely affect Barclays' independence."

39. The Proxy Statement, however, fails to disclose the contents of Barclays' letter and the basis for the Board's determination "that the relationships disclosed in such letter would not adversely affect Barclays' independence."

40. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

10

41. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 4. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction

42. The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

43. The Proxy Statement provides that, during the sales process, a financial sponsor who was interested in a potential strategic transaction involving HMS "proposed a stock combination between one of its portfolio companies and HMS that the Board determined was not in the best interests of HMS or its stockholders based on its financial analysis and assessment of the complexity and challenges of successful execution."

44. The Proxy Statement, however, fails to disclose the terms and values of the financial sponsor's stock combination proposal, and the specific reasons underlying the Board's determination that the proposal "was not in the best interests of HMS or its stockholders based on its financial analysis and assessment of the complexity and challenges of successful execution." This information is necessary in order for the Company's shareholders to evaluate and compare the appropriateness of the Proposed Transaction as compared to all other potential opportunities, particularly those that do not involve the sale of the entire Company.

45. The Proxy Statement provides that the Company set a deadline of December 17, 2020 to receive definitive, binding proposals from potential buyers. Then, on December 17, 2020, "Private Equity Firm C informed Barclays that Private Equity Firm C was not prepared to submit a proposal by the bid deadline. Representatives of Barclays informed representatives of Private Equity Firm C that the process would likely continue moving forward and encouraged Private Equity Firm C to submit a final bid."

46. The Proxy Statement, however, fails to disclose whether Private Equity Firm C ultimately approached the Company with a proposal and, if so, the terms and values of such proposal. The Proxy Statement further fails to disclose the Board's rationale for not continuing discussions with Private Equity Firm C and whether it believed any such discussions could lead to an offer superior than Gainwell's. This information is necessary for the Company's shareholders to evaluate the fairness of the Proposed Transaction, particularly as compared to a potential transaction with Private Equity Firm C.

47. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

48. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

50. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and

misleading Proxy Statement.

51. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

52. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

53. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

54. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

56. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned

company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

57. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants on the special committee to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

58. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

59. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's

shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.    Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.    Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 10, 2021

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
      zhalper@halpersadeh.com

*Counsel for Plaintiff*